**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROGER BELL,

                *Plaintiff,*

      v.

EAST RIVER FAMILY
STRENGTHENING COLLABORATIVE,
INC.,

                *Defendant.*

                              Civil Action No. 1:18-cv-01331 (CJN)

## <u>MEMORANDUM OPINION</u>

Roger Bell brings this action against his former employer, East River Family

Strengthening Collaborative, Inc., asserting violations of the Employees of District Contractors

and Instrumentality Whistleblower Protection Act ("DCWPA"), defamation, and intentional

interference with economic interest.  *See generally* Compl., ECF No. 1.  East River has filed a

Motion for Summary Judgment on all claims.  *See generally* Def.'s Mot. for Summ. J. ("Def.'s

Mot."), ECF No. 17.  For the reasons below, the Court grants East River's Motion.

### I.       Background

Bell was employed by East River as the Project Coordinator of the Credible Messenger

Initiative, which provides mentoring to at-risk and formerly incarcerated youth in the custody of

the District of Columbia.  *See* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. ("Def.'s Mem.")

at 1, ECF No. 17 at 4; Def.'s Statement of Material Facts ("Def.'s SOMF") ¶ 1, ECF No. 17 at

48; Pl.'s Resp. to Def.'s SOMF ("Pl.'s Resp.") ¶ 1, ECF No. 21-56.  The Initiative is funded by

the D.C. Department of Youth Rehabilitation Services ("DYRS").  Def.'s SOMF ¶¶ 1–2; Pl.'s

Resp. ¶¶ 1–2.  In his role as Project Coordinator, Bell shared responsibility for managing East

River's contract with DYRS, supervising staff, reviewing time records, overseeing daily operations, and reporting to and informing DYRS of the status of Initiative efforts and any program-related issues or problems.  Def.'s SOMF ¶ 1; Pl.'s Resp. ¶ 1.

After an internal investigation revealed Bell had engaged in improper conduct, East River terminated his employment on April 18, 2018.  Def.'s SOMF ¶¶ 7–8; Pl.'s Resp. ¶¶ 7–8.  East River states that it initiated the investigation after an employee, Danielle Crouch, alleged that she and Bell had engaged in a scheme of padding her timesheets and splitting the amount she was overcompensated.  Def.'s SOMF ¶ 8; Pl.'s Resp. ¶ 8.  According to Crouch, Bell gave her blank timesheets to sign, Bell filled out the hours and submitted the timesheets, and then once East River paid Crouch, Crouch would cash the check and split the extra pay with Bell.  Aff. of Danielle Crouch ("Crouch Aff.") ¶¶ 4–6, ECF No. 17-9.  East River states that after it conducted the investigation, it consulted with counsel who advised East River that it had cause to terminate Bell.  Def.'s SOMF ¶ 9; Pl.'s Resp. ¶ 9.[1]

Bell disputes that the investigation supported Crouch's claims, Pl.'s Resp. ¶ 8, and asserts that he was fired because of complaints he made to DYRS about East River's operations—not the internal investigation.  Bell outlines four separate complaints he made about East River.  Pl.'s Mem. of P. & A. in Opp'n to Summ J. ("Pl.'s Opp'n") at 8–14, ECF No. 21.  First, he says that he complained to DYRS about East River's failure to expend funds that, in Bell's view at least, should have been spent on program activities.  *See* Pl.'s Resps. to 1st Set of Interrogs. ("Pl.'s ATI") at 15–18, ECF No. 17-1; Pl.'s Statement of Facts Demonstrating Genuine Disputes of Material Facts Necessitating Trial ("Pl.'s SOMF") ¶ 19, ECF No. 21-55; *see also* Pl.'s Opp'n

---

[1] Bell disputes whether the attorneys "advised [East River] to terminate [him] or that [East River's] counsel conducted any independent inquiry that resulted in advice to terminate [him]." Pl.'s Resp. ¶ 9.

at 8–10.  Second, Bell claims that he disclosed East River's failure to make timely and appropriate mileage reimbursements.  *See* Pl.'s SOMF ¶¶ 42–44; *see also* Pl.'s Opp'n at 8. Third, Bell claims he reported that staff were misreporting their time, which, in turn, meant that the Initiative was failing to abide by the DYRS grant's hours requirements.  Pl.'s ATI at 18; *see also* Pl.'s Opp'n at 10–12.  Finally, he claims that he reported that East River missed payroll on November 30, 2017, an event that East River does not dispute.  Pl.'s ATI at 16–17; Def.'s Mem. at 11–13.

Bell further claims that, following his termination, Mae Best, East River's Executive Director, told various individuals, including officials at DYRS and Progressive Life (a DYRS fiscal mediator that administered funds for East River's grant), that East River had terminated Bell's employment because of Crouch's fraud claim.  *See* Pl.'s SOMF ¶¶ 215–21.  Bell further claims that DYRS then commented to heads of other community development and support organizations that he had been fired because of the alleged fraudulent scheme.  *Id.* ¶ 222.  Bell claims that these statements have caused him reputational harm.  *Id.*

Bell asserts violations of the DCWPA, defamation, and intentional interference with economic interest.  *See generally* Compl.  After discovery, East River moved for summary judgment on all claims.  *See generally* Def.'s Mot.  Bell opposes summary judgment on his DCWPA and defamation claims but concedes "that there is insufficient evidence of damages for him to be able to prevail" on his intentional interference with economic interest claim.  Pl.'s Opp'n at 36–37.  As a result, judgment will be entered in East River's favor on that claim.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When the moving party does not bear the burden of persuasion at trial, its burden 'may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 60–61 (D.D.C. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). After the moving party has met its burden, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex*, 477 U.S. at 324. Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.* "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255.

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). But the nonmoving party's opposition must consist of more than unsupported allegations or denials and must be supported by facts from affidavits, declarations, or other competent evidence that show there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

Of particular relevance here, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements."

*Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) (citation omitted).  "That is because 'conclusory allegations' and 'unsubstantiated speculation,' whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, 'do not create genuine issues of material fact.'"  *Mokhtar*, 83 F. Supp. 3d at 61 (citation omitted).

### III.    Analysis

### A.    The Whistleblower Claim

The DCWPA prohibits a supervisor from "threaten[ing] to take or tak[ing] a prohibited personnel action or otherwise retaliate against an employee [1] because of the employee's protected disclosure or [2] because of an employee's refusal to comply with an illegal order."  D.C. Code § 2-223.02(a) (2020).  The DCWPA defines a "protected disclosure" as

> [a]ny disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or to a public body that the employee reasonably believes evidences:
>
> (A)    Gross mismanagement in connection with the administration of a public program or the execution of a public contract;
>
> (B)    Gross misuse or waste of public resources or funds;
>
> (C)    Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D)    A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E)    A substantial and specific danger to the public health and safety.

*Id.* § 2-223.01(7).

The DCWPA itself incorporates a burden-shifting framework, D.C. Code § 2-223.03(b),[2] and the D.C. Court of Appeals has applied the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to DCWPA cases. *Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007). As a result, at summary judgment, a plaintiff alleging a violation of the DCWPA must make "a proffer of admissible evidence that their 'protected activity' . . . was a 'contributing factor'" to the alleged prohibited personnel action, "measured under a 'but for' analysis." *Id.* at 1118–19. Assuming such evidence exists, the burden shifts to the defendant to demonstrate "that the alleged action would have occurred for legitimate, independent reasons even if the [plaintiff] had not engaged in activities protected by the [DCWPA]." D.C. Code § 2-223.03(b). If the defendant meets that burden, the plaintiff bears the burden of proving that the defendant's explanation is pretextual. *See Johnson*, 935 A.2d at 1118.

"A 'protected disclosure' under the [DCWPA] is one that the employee 'reasonably believes' evidences one or more of the circumstances delineated" in the Act. *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008). "An employee's 'reasonable belief turns on whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions . . . evidence illegality, gross abuse, etc." *Harris v. D.C. Water & Sewer Auth.*, 172 F. Supp. 3d 253, 261 (D.D.C. 2016)

---

[2] D.C. Code section 2-223.03(b) reads:

> In a civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 2-223.02 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the employing District instrumentality or contractor, or the person or entity that employed the security officer, to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

(citation omitted); *see also Zirkle v. District of Columbia*, 830 A.2d 1250, 1259–60 (D.C. 2003) (adopting the disinterested-observer test).  "To establish a 'protected disclosure' on the basis of 'gross mismanagement' . . . [a plaintiff] must show ' a management action or inaction that creates a substantial risk of significant adverse impact on an agency's ability to accomplish its mission." *District of Columbia v. Poindexter*, 104 A.3d 848, 855 (D.C. 2014).  "Gross waste of public funds is a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government." *Id.* at 857 (citation omitted).  And "[a]buse of authority occurs when there is an arbitrary or capricious exercise of power by [an] . . . official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons." *Id.*

"A purely subjective perspective of an employee is not sufficient even if shared by other employees." *Zirkle*, 830 A.2d at 1260 (citation omitted).  "'[T]he basis for determining the nature of . . . charges' that a putative whistleblower has made 'are the statements . . . in [his] complaint' to a supervisor or to a public body, 'not [his] subsequent characterization of those statements' in litigation." *Wilburn*, 957 A.3d at 925 (citation omitted).  And the DCWPA requires that "an employee must have had such a belief *at the time the whistle was blown*." *Freeman v. District of Columbia*, 60 A.3d 1131, 1143 (D.C. 2012).

Accordingly, for Bell's complaints to constitute protected disclosures, he must demonstrate that the facts known to him at the time would reasonably have led a disinterested observer to conclude that East River was engaged in gross mismanagement, gross misuse or waste of public resources, or the like.  Bell argues that he made four such protected disclosures.[3]

---

[3] Bell limits his arguments to four theories of protected disclosures despite pointing to others at other points in the litigation.  *See* Pl.'s Opp'n at 8 & 8 n.1.

1.      **Mileage reimbursements**

East River argues that Bell waived reliance on his alleged disclosure regarding mileage

reimbursement because Bell failed to include it in response to an interrogatory that specifically

sought his theories of protected disclosures and because Bell's complaints about mileage

reimbursements could never "rise to the level of protected whistleblower conduct."  Def.'s Reply

at 7, ECF No. 25.[4]  Regardless of whether he may have waived this theory, Bell does not make

any argument in support of it.  *See* Pl.'s Opp'n at 8 (discussing only East River's alleged waiver).

And in any event, it is hard to see how Bell's purported complaint about East River's failure to

make timely and appropriate mileage reimbursements could rise to the level of a protected

disclosure under the DCWPA.  *See* D.C. Code § 2-223.01(7)(D) (defining "protected disclosure"

as a "violation . . . of a term of contract between the District government and a District

government contractor which is *not of a merely technical or minimal nature*" (emphasis added)).

2.      **Missed payroll**

Bell also relies on his disclosure that East River missed payroll on one occasion in

November 2017.  Bell argues that "[e]ven a one-day delay in pay could have easily resulted in

late rent or mortgage payments and bounced bill payments."  Pl.'s Opp'n at 12.  And he contends

---

[4] In his Opposition, Bell asserts that East River "failed to address [his] complaints about East
River's failure to reimburse his reasonable mileage expenses."  Pl.'s Opp'n at 8 (citation
omitted).  This, in Bell's view, constitutes waiver of the argument that these complaints are not
protected under the DCWPA.  *Id.*  East River counters by noting that Bell did not raise the theory
of protected disclosure in his responses to East River's interrogatories "despite a specific
interrogatory seeking that information."  Def.'s Reply at 7.  Because Bell did not include this
theory in his response to East River's interrogatory that asked Bell to "[i]dentify and provide
detailed descriptions of each and every occasion during your employment with defendant that
you contend constituted or was a 'protected disclosure' as defined in the [DCWPA]," Pl.'s ATI
at 18, East River did not waive its ability to counter that argument in its Reply.

that "the failure to make payroll could have led to an exodus of employees who were already

wary of continuing to perform their work."  *Id.* (citations omitted).

The Court disagrees that this disclosure was sufficient to trigger the DCWPA.  East River

does not dispute that it missed its November 2017 payroll by four days.  But Bell's speculation

of the fallout from missing payroll one time does not rise to the level of gross mismanagement,

gross misuse of public funds, or abuse of authority.

Bell theorizes about a significant impact on East River in the way of "an exodus of

employees" that "were already wary of continuing to perform their work," which he claims

equates to gross mismanagement.  Pl.'s Opp'n at 12 (citing Pl.'s SOMF ¶¶ 27–29, 33, 39).  But

the facts (or at least the facts on which Bell relies) do not support his claim.  Bell does not

respond to East River's explanation for its one-time delay nor does he explain why a

disinterested observer would reasonably conclude why a single delay would constitute gross

mismanagement.  Instead, Bell points to deposition testimony and his own interrogatory

responses that stand, at most, for his own speculation that employees might leave because one

paycheck was late.

Bell also attempts to argue that this incident constituted a gross waste of public funds, but

he puts forward no facts that this incident was "significantly out of proportion to the benefit

reasonably expected to accrue to the government," *Poindexter*, 104 A.3d at 855.  While he does

argue that "East River's communications to employees about the missed pay made it appear that

East River was being untruthful," Pl.'s Opp'n at 13 (citing Pl.'s SOMF ¶ 72), and that "[a]

reasonable person in [his] position certainly could have expected that East River would not be

paying salaries into the foreseeable future," *id.*, he ignores East River's repeated communications

about the missed payroll and the fact that paychecks were distributed one business day after East

River alerted employees to the error.  Pl.'s SOMF ¶¶ 72–73.  Bell also does not counter East

River's explanation for the delay:  that a major funder was late in making its payment under the

grant.  Def.'s Reply at 8 (citing Dep. of Mae Best at 56–57, ECF No. 25-3).[5]

### 3. Non-expenditure of activity funds

Bell also argues that he complained that East River failed to expend activity funds, and

that this failure was either a violation of a term of a contract with the District or, in the

alternative, gross mismanagement.  *See* D.C. Code § 2-223.01(7)(A), (D); *see also* Pl.'s Opp'n at

8–10.  As for the contract argument, Bell did not know whether the failure to spend activity

funds was a breach of contract.  *See* Pl.'s Opp'n at 9 (citing Pl.'s SOMF ¶¶ 19–22, 24, 35, 56).

Indeed, Bell conceded at his deposition that he had never seen the contract, did not have personal

knowledge of its terms, and was not involved with the budget.  Dep. of Roger Bell at

39:9–44:14, ECF No. 21-6.

It is thus doubtful that Bell could form a reasonable belief that East River was in breach

of its contract with DYRS.  To be sure, Bell claims knowledge of the contractual requirements

based on conversations with DYRS employees.  But Bell does not put forward any evidence to

permit the conclusion that, based on the facts known to him at the time, East River's actions

---

[5] Bell mentions in his brief that this episode constituted an abuse of authority by East River, but
he does little to develop this argument, pointing to no facts indicating an "arbitrary or capricious
exercise of power" by East River "that adversely affect[ed] the rights of any person or that
result[ed] in personal gain or advantage to [East River] or to preferred other persons."
*Poindexter*, 104 A.3d at 855.  Rather, East River acknowledged the payroll delay and
communicated with employees until the issue was remedied, *e.g.*, Pl.'s SOMF ¶ 72, steps that
can hardly be considered an "arbitrary or capricious exercise of power," *Poindexter*, 104 A.3d at
855.

Bell also briefly alleges that the disclosure about missed payroll is protected because it was a
violation of D.C. law that was not technical or minimal in nature.  Pl.'s Opp'n at 12.  Despite the
argument not being fully developed, it is hard to see how a one-business day delay in processing
payroll was anything other than minimal.

reasonably evidenced a violation of a contract term that required the activity funds to be spent.
Bell testified during his deposition that the DYRS employee "was, like, I saw the budget, I mean,
I saw what remained in the budget, and it's just—you guys aren't utilizing it." *Id.* at
169:18–170:5.  And he stated that the DYRS managers stated that they were "hearing you guys
don't have gift cards." *Id.* at 172:18–19.  To which he responded, "'Yeah, we don't,' you know.
Do I need to call?  Like I told them, you can call them.  I mean, we request them.  We're just not
getting them." *Id.* at 172:20–173:1.  These statements, without more, could not form the basis
for a reasonable belief that East River was breaching its contract.  And as to any argument that
Bell's disclosure was more generally about East River's failure to spend funds allocated to it,
Bell concedes that the DYRS employee informed him of that fact, such that any future disclosure
by Bell would not be protected under the DCWPA.  *See Wilburn*, 957 A.2d at 926 (emphasizing
that DCWPA protection is meant to extend to employees who possess knowledge of concealed
wrongdoing).

　　　　Alternatively, Bell argues that this complaint satisfies the DCWPA's "gross
mismanagement" prong.  Pl.'s Opp'n at 10.  But Bell offers essentially no argument or facts to
establish how East River's failure to spend activity funds, and to instead promote free events,
could have constituted gross management.  At most, Bell has established an issue for trial about
whether the funds were being spent.  He does not even attempt to explain how using free
activities created a substantial risk of adverse impact on East River's ability to accomplish its
mission of engaging with children in the community.  Instead, Bell appears to have disagreed
with East River over its purported policy of promoting free events over paid events—a
disagreement that the DCWPA does not protect.  *E.g.*, *Zirkle*, 830 A2d at 1260 ("The [DCWPA]

is not a weapon in arguments over policy . . . ." (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

### 4.    Stealing and misreporting of employees' time

Bell also asserts that his "complaints about staff stealing time and failing to abide by requirements for engagement hours under the Grant . . . implicated violations of the grant, or gross misuse or waste that created a substantial risk of significant adverse impact on [East River]."  Pl.'s Opp'n at 10.  In particular, relying on his own deposition testimony, Bell provides a rough personal estimate about the amount of time that he alleges three employees were stealing or misreporting, but he does not support his claim with any documentation or other evidence and does not explain whether other evidence is otherwise unavailable.  To be sure, Bell points to evidence indicating that other East River employees were aware that Bell was concerned with whether certain employees were working their assigned hours, *e.g.*, Pl.'s SOMF ¶¶ 63–64, 67–69, but that evidence, without more, does not help him establish a prima facie case.  Outside of his own statements, Bell does not explain (through providing an accounting or otherwise) how the allegedly stolen hours created "a substantial risk of significant adverse impact on [East River's] ability to accomplish its mission," *Poindexter*, 104 A.3d at 855, were "significantly out of proportion to the benefit reasonably expected to accrue to the government," *id.*, or established a nontechnical or nonminimal breach of East River's contract with DYRS.  *See Bonieskie*, 540 F. Supp. 2d at 195 ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements.").

### B.    The Defamation Claim

East River also argues that it is entitled to summary judgment on Bell's defamation claim.  To establish defamation under D.C. law, a plaintiff must show:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Williams v. District of Columbia*, 9 A.3d 484, 491 (D.C. 2010) (citation omitted).  "A statement that falsely imputes a criminal offense is defamatory *per se*."  *Hall v. District of Columbia*, 867 F.3d 138, 149 (D.C. Cir. 2017) (citing *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979)) (other citation omitted).  "[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'"  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (citation omitted).  "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury."  *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990) (citation omitted).

Bell claims that "East River defamed him when it told DYRS and Progressive Life and InnerCity officials that [he] was terminated because of his involvement in the fraudulent scheme that Ms. Crouch had alleged."  Pl.'s Opp'n at 32.[6]  For its part, East River concedes that it made "[s]tatements regarding the investigation and [Bell's] discharge were shared with representatives of DYRS . . . and/or the government's fiduciary manager, Progressive Life," Def.'s SOMF ¶ 12.  But East River argues that Bell could not have been defamed because these statements were

---

[6] In his Complaint, Bell articulates the defamatory statement as follows:  that he "had been fired from . . . East River for being actively involved in a scheme to defraud the District of Columbia government by stealing funds that were intended to be used on helping at-risk children."  Compl. ¶ 44.

"substantially true."  Def.'s Mem. at 26 (citing *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 59
(D.D.C. 2002)).

"To successfully assert this defense, [East River] must prove that the statements made
were substantially true, and that any minor misstatements of fact or inaccuracies of expression
were immaterial."  *Lohrenz*, 223 F. Supp. 2d at 59 (citing *Moldea v. N.Y. Times*, 22 F.3d 310,
318 (D.C. Cir. 1994)).  And "'[s]ubstantially true' means that the 'gist' of the statement is true or
that the statement is substantially true, as it would be understood by its intended audience."
*Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) (citation omitted).  In
support of its argument, East River points to (1) Crouch's affidavit, explaining Bell's involving
in the scheme to inflate her hours and detailing how she informed East River's management
team, *see generally* Crouch Aff.; (2) evidence that all four of East River's decisionmakers found
her report credible, Def.'s SOMF ¶ 8 (citations omitted); and (3) the human resources
investigation into the behavior, which led to his termination, *id.* ¶ 9.  Bell counters that, taking
the evidence in the light most favorable to him, a jury could conclude that the leadership knew
Crouch's claims were false and thus that their conclusion about his involvement in the fraudulent
scheme was incorrect.  Pl.'s Opp'n at 33.  He supports his claim by criticizing East River's
investigation as a whole, including by attacking Crouch's and other employees' credibility,
pointing out that minor details in and descriptions of the investigation were not accurate,
asserting that the investigation was not as comprehensive as it should have been, claiming that
members of East River's leadership team held a bias against him in favor of other employees,
and arguing that East River falsified numerous statements and affidavits—among other items.

To say that the record is muddled in this case would be an understatement.  But even
taking the record in the light most favorable to Bell, summary judgment is appropriate.  Bell

argues that he was defamed when East River "told DYRS and Progressive Life and InnerCity officials that [he] was terminated because of his involvement in the fraudulent scheme that Ms. Crouch had alleged." Pl.'s Opp'n at 32.  Bell, however, fails entirely to establish that anything *in this statement* was false.  Indeed, Bell does not dispute that the investigation occurred and that East River concluded, based on its review of the facts collected and after consultation with two attorneys, that he was involved in the scheme and should be terminated. Bell instead focuses his argument on disputing the intricacies of the underlying investigation that took place at East River and challenging the reasonableness of the conclusion reached by East River's management.  Bell's critique of the investigation itself, points at most to "minor misstatements of facts or inaccuracies of expression, " *Lohrenz*, 223 F. Supp. 2d at 59 (citation omitted), whereas the "gist" of the allegedly defamatory statement was true:  Bell was fired after East River conducted an internal investigation that led to East River's conclusion that Bell was involved in an alleged fraudulent scheme.

## IV.    Conclusion

Because no reasonable juror could find, based on the present record, that Bell made a protected disclosure under the DCWPA or that East River made a defamatory statement about Bell, East River is entitled to summary judgment on both claims.  East River's Motion for Summary Judgment is therefore **GRANTED**.  An order consistent with this Memorandum Opinion will be issued contemporaneously.

DATE:  August 11, 2020

CARL J. NICHOLS
United States District Judge